| | | |
|---|---|---|
| Rashon Markell Pike, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 CV 00094 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| John Foster, Marchand Wright, | ) | |
| Lester Vaughn, and Isaura Carmona, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Rashon Pike brought this civil-rights action against Chicago Police Officers Lester Vaughn, Marchand Wright, and Isaura Carmona, and Chicago Police Detective John Foster, alleging that they conducted an unreasonable search and seizure in violation of the Fourth Amendment.[1] Now the Officers[2] move for summary judgment, asserting that they lawfully seized and searched Pike under *Terry v. Ohio*, 392 U.S. 1 (1968). R. 93, Defs.' Mot. Summ. J.[3] The Officers also assert that, at the least, qualified immunity applies to bar Pike's claim. *Id.* For the

---

[1]The Court has subject-matter jurisdiction over Pike's § 1983 claim under 28 U.S.C. § 1331.

[2]For convenience's sake, the Court refers to Officers Vaughn, Wright, and Carmona, and Detective Foster collectively as "the Officers" throughout the Opinion.

[3]Citations to the record filings are "R." followed by the docket number and, when necessary, a page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for the Officers' Statement of Facts) [R. 92]; "PSOF" (for Pike's Statement of Additional Facts) [R. 102]; "Pl.'s Resp. DSOF" (for Pike's Response to the Officers' Statement of Facts) [R. 101]; and "Defs.' Resp. PSOF" (for the Officers' Response to Pike's Statement of Additional Facts) [R. 110]. Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is challenged, it is so noted.

reasons described below, the motion is granted in large part and denied as to one very limited claim against Defendant Vaughn.

## I. Background

For purposes of this motion, the following facts are viewed in the light most favorable to Pike (because he is the non-movant), and all reasonable inferences are drawn in his favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On the night of December 29, 2010, Officers Vaughn, Wright, and Carmona were on patrol, riding in an unmarked Chicago police car. R. 92, DSOF ¶ 21; R. 92-2 (Exh. B, Vaughn Dep. 16:24-17:8); R. 92-3 (Exh. C, Wright Dep. 14:13-20). Officer Wright drove the car that night, while Officer Vaughn sat in the front passenger seat and Officer Carmona sat in the back of the car. DSOF ¶ 22; Vaughn Dep. 18:22-19:5; Wright Dep. 16:12-13; R. 92-4 (Exh. D, Carmona Dep. 19:13-19). While riding in the car, the officers heard a flash message on the police radio. DSOF ¶ 22; Vaughn Dep. 16:16-20; Wright Dep. 14:21-23; Carmona Dep. 16:21-22. The flash message informed the officers that an armed robbery had just occurred at 418 West Englewood Avenue in Chicago, Illinois. DSOF ¶ 22; Wright Dep. 15:11-16; Carmona Dep. 16:23-17:2. It described the armed offenders as three African-American males wearing all-dark clothing and fleeing westbound from 418 West Englewood. DSOF ¶ 23; Vaughn Dep. 17:12-15; Wright Dep. 14:24-15:10; Carmona Dep. 16:23-17:10.

The officers, who were already in the neighborhood, began driving towards 418 West Englewood and looking for persons matching the description transmitted

on the flash radio. DSOF ¶ 24; Vaughn Dep. 17:24-18:7; Wright Dep. 15:24-16:11; Carmona Dep. 19:5-9. Officers Vaughn and Carmona then saw a man (who turned out to be Pike) running northbound on South Parnell Street; Pike was wearing dark clothing.[4] DSOF ¶ 24; Vaughn Dep. 18:18-21, 19:6-13, 19:17-19; Wright Dep. 17:12-14; Carmona Dep. 19:20-20:2, 20:12-17; Pl.'s Resp. DSOF ¶ 24 ("[I]t is undisputed Mr. Pike was observed running north on Parnell [Avenue] towards 63rd."). The intersection[5] of Parnell Avenue and 63rd Street is around three blocks southeast of 418 West Englewood. Officer Wright made a U-turn and headed towards Pike. DSOF ¶ 25; Vaughn Dep. 19:9-13; Wright Dep. 16:14-24; Carmona Dep. 21:7-10. Pike had slowed to a walk by the time the officers stopped him. DSOF ¶ 26, R. 101, Pl.'s Resp. DSOF ¶ 26; Wright Dep. 17:1-5; Carmona Dep. 21:16-19; R. 92-1 (Exh. A, Pike Dep. 32:18-23).

The officers then got out of the police car and Officer Vaughn began to search Pike. DSOF ¶ 30; Pl.'s Resp. DSOF ¶ 30; Vaughn Dep. 19:20-22, 21:5-7; Wright Dep. 18:2-5. Although the parties dispute the scope of the search, *compare* DSOF ¶¶ 30-32, *with* Pl.'s Resp. DSOF ¶¶ 30-32, both parties acknowledge (for purposes of summary judgment) that Officer Vaughn reached into Pike's pant pockets. *See* DSOF ¶ 32 ("Plaintiff admits that Officer Vaughn conducted the patdown *by going in his pants pockets* and checking his outer garments." (emphasis added)); Exh. A,

---

[4] Pike admits that he was wearing blue jeans, a black hoodie, and brown boots when the officers stopped him. *See* R. 101, Pl.'s Resp. DSOF ¶ 28; R. 92-1 (Exh. A, Pike Dep. 30:14-17).

[5] Google Maps shows that Parnell Avenue is actually a wide sidewalk, rather than a roadway, by the time it meets-up with 63rd Street. Parnell Avenue becomes the wide sidewalk at 63rd Place, which is less than a half-block south of 63rd Street.

Pike Dep. 43:11-18. The officers did not find any weapons on Pike. DSOF ¶ 31; Pl.'s Resp. DSOF ¶ 31; Vaughn Dep. 21:24-22:7; Wright Dep. 20:4-7; Carmona Dep. 22:7-13.

After searching and handcuffing[6] Pike, the officers placed him in the back of the police car and drove to the victims' house—418 West Englewood—for what is known as a "showup" identification, that is, bringing the suspect to the victims to see whether the victims recognize the suspect. DSOF ¶ 33; Pl.'s Resp. DSOF ¶ 33; Exh. A, Pike Dep. 42:2-6, 56:21-57:17; Vaughn Dep. 22:19-22; Wright Dep. 18:2-5; Carmona Dep. 23:15-24. The Officers maintain—and Pike does not directly dispute[7]—that the police car did not have a protective barrier separating the front of the car from the back. DSOF ¶ 34; Pl.'s Resp. DSOF ¶ 34; Vaughn Dep. 45:22-46:11; Carmona Dep. 23:22-24:3. After the victims positively identified Pike as one of the armed robbers, the officers took him to the Seventh District police station.[8]

---

[6]It is unclear exactly when the officers handcuffed Pike. Pike maintains that the officers handcuffed him as soon as they stopped him. Exh. A, Pike Dep. 32:24-33:5. The officers' deposition testimony is ambiguous as to whether they handcuffed Pike before or after searching him. *See, e.g.*, Vaughn Dep. 45:12-24; Wright Dep. 20:11-22; Carmona Dep. 23:22-24:3. For summary-judgment evaluation purposes, Pike's version is accepted as true.

[7]The Officers' Statement of Facts states: "That night, the Officers were driving a police vehicle that did not include a protective barrier between the front and back passenger compartments." DSOF ¶ 34. In Pike's Response to the Officers' Statement of Facts, he failed to state whether he disputes this asserted fact. *See* Pl.'s Resp. DSOF ¶ 34. Local Rule 56.1(b) warns that "[a]ll material facts set forth in the statement required of the moving party *will be deemed to be admitted unless controverted by the statement of the opposing party*." N.D. Ill. R. 56.1(b)(3)(C) (emphasis added). Because Pike does not dispute the Officers' allegation that the police car did not have a protective barrier, the Court will treat this allegation as undisputed.

[8]Again, Pike fails to properly respond to the Officers' Statement of Facts, which alleges that the officers brought him to the police station after the victims positively identified Pike at 418 West Englewood. *See* DSOF ¶¶ 36, 37. Instead, Pike disputes the relevance of these alleged facts and injects legal argument as to what the Court can and cannot consider as evidence at the summary judgment stage. *See* Pl.'s Resp. DSOF ¶¶ 36,

DSOF ¶ 37; Vaughn Dep. 25:8-15, 26:7-13; Wright Dep. 27:10-22, 31:4-15; Carmona Dep. 26:17-22, 27:13-16; R. 92-6 (Exh. F at 32:18-33:6); R. 92-8 (Exh. H at 4). Pike did not encounter Detective Foster until he arrived at the police station that night. DSOF ¶ 38; R. 92-5 (Exh. E, Foster Dep. 21:13-15, 22:3-14, 22:24-23:13). It is undisputed that Detective Foster had no involvement in stopping and searching Pike. *See* Pl.'s Resp. DSOF ¶ 38.

In April 2012, a jury convicted Pike of the armed robbery and residential burglary at 418 West Englewood.[9] R. 92-9 (Exh. I, Certified Statement of Conviction at FCRL 000166). Pike is currently serving concurrent prison terms of 35 and 20 years. *Id.* at FCRL 000167.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating

---

37. At a minimum, the non-movant must "indicat[e] that it agrees with or denies the allegation" made in a moving party's Rule 56.1 Statement. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004) (affirming district court's decision to strike a non-moving party's Rule 56.1 responses because the non-moving party "merely state[d] the allegations are irrelevant" instead of agreeing with, or denying, the allegations); *see also* N.D. Ill. R. 56.1(b)(3)(C). Again, because Pike does not dispute the Officers' allegations regarding the show-up and the course of events that took place thereafter—much less offer record evidence rebutting these allegations—the Court will treat these allegations as undisputed. *See* N.D. Ill. R. 56.1(b)(3)(B) (non-moving party's response "*shall* contain … *in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon*" (emphasis added)).

[9] Although Pike disputes the relevance and prejudice of these facts, he does not dispute their accuracy. *See* Pl.'s Resp. DSOF ¶ 39. So Pike's conviction and prison sentence are deemed to be undisputed. *See supra* Section I at 4 n.7 & n.8.

summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

Pike alleges that the Officers conducted an unreasonable search and seizure in violation of the Fourth Amendment. In response, the Officers argue that Pike's claim fails because they had reasonable suspicion to stop—which entailed handcuffing, detaining, and transporting Pike for the show-up—and to search Pike. As detailed below, even viewing the evidence in Pike's favor, the Officers had reasonable suspicion to conduct an investigative stop of Pike, and to handcuff, detain, and transport him to the show-up as part of the stop. So Pike's primary Fourth Amendment claim—the seizure—must be dismissed in its entirety. But there is one limited—very limited—aspect of the Fourth Amendment *search* claim

that survives summary judgment. As explained below, if a jury were to find that Officer Vaughn went beyond a protective pat-down by checking inside Pike's pockets and lifting Pike's pants leg (as Pike asserts he did), then the search exceeded what the Fourth Amendment allows (even to the point that qualified immunity does not apply). With regard to Detective Foster, no claim survives against him because he had no personal involvement in stopping and searching Pike.

## A. Reasonableness of the Seizure

When assessing the reasonableness of the seizure, really there are two separate claims at issue: first, whether the Officers had reasonable suspicion to stop Pike at all; and second, whether the seizure afterwards (including the handcuffing and show-up) was reasonable. On Pike's first claim, he contends that the Officers should not have made the initial investigatory stop. When determining whether an investigatory stop was unreasonable under the Fourth Amendment, courts examine (a) "whether the police were aware of specific and articulable facts giving rise to reasonable suspicion"; and (b) "whether the degree of intrusion was reasonably related to the known facts." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994); *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011).

### i. Reasonable Suspicion for Investigatory Stop

Police officers may conduct a brief, investigatory stop of a person when they have reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *e.g.*, *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003).

Reasonable suspicion is less demanding than probable cause (which itself is a quantum of proof less than a preponderance of the evidence). *United States v. Sokolow*, 490 U.S. 1, 7 (1989). With regard to the facts necessary for reasonable suspicion, the Fourth Amendment does demand "at least a minimal level of objective justification for making the stop," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), requiring more than an "inarticulate hunch[ ]." *Terry*, 392 U.S. at 22. When determining whether reasonable suspicion exists, courts "examine the totality of the circumstances known to the police at the time of the stop, including the experience of the officers and the behavior and characteristics of the suspect." *Lenoir*, 318 F.3d at 729 (citing *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir. 1996)). Thus, sometimes otherwise innocent behavior "may give rise to reasonable suspicion when viewed in the context of other factors at play." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006).

When it comes to making an investigatory stop based on a report of a crime, the Seventh Circuit has held that, under the totality of the circumstances standard, "police observation of an individual, fitting a police dispatch description ... , near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch." *Lenoir*, 318 F.3d at 729; *see also United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005); *United States v. Barnett*, 332 F. App'x 324, 325 (7th Cir. 2009) ("Factors relevant in assessing reasonable suspicion ... include the specificity of the description of the suspect, the number of people in the area, where the person was stopped, and how long ago the

crime occurred."). Moreover, "the dangerousness of the crime" also is a factor in the reasonable suspicion analysis. *United States v. Burgess*, 759 F.3d 708, 711 (7th Cir. 2014).

In *United States v. Broomfield*, for example, the Seventh Circuit affirmed the district court's holding that an officer had reasonable suspicion to stop Broomfield because he matched a description of the suspect, and because the officer stopped him near in time and geographic location to the armed robbery.[10] 417 F.3d at 655. Specifically, a police dispatch described the suspect as "a black man wearing dark clothing and brandishing a silver-colored pistol … ." *Id.* About 15 minutes after hearing the dispatch, the officer stopped Broomfield, an African-American man wearing dark clothing, less than a mile from where the robbery occurred. *Id.* The Seventh Circuit reasoned that "[a]lthough the description of the robber lacked specificity, Broomfield did fit the description; he was stopped about as far from the store as he could have gotten walking briskly, given the amount of time that had elapsed since the robbery, and the streets in the vicinity of the store were nearly deserted … ." *Id.* Even despite the admittedly vague description of the suspect, the court held that "[t]here was indeed a reasonable basis for suspecting that he was the robber." *Id.*; *see also Barnett*, 332 F. App'x at 325 (holding that officer had reasonable suspicion to stop the defendant, whom the officer found "shortly after the crime, near the scene, and with his brother," based on a broadcast describing

---

[10]*Broomfield* ultimately held that a seizure did not take place under the Fourth Amendment. 417 F.3d at 655. Nevertheless, the court analyzed whether there was reasonable suspicion to stop the individual *had* the Fourth Amendment applied. *Id.* at 655-66 ("This discussion assumes the stop rose to the level of a seizure within the meaning of the Fourth Amendment.").

the suspect as wearing "a blue shirt and black jeans—check that black jeans and blue shirt").

Here too a reasonable factfinder, even giving Pike the benefit of inferences, must conclude that the Officers had reasonable suspicion to stop Pike. As in *Broomfield*, the description of the armed robbers combined with Pike's temporal and geographic proximity to the robbery gave the officers a reasonable basis to suspect Pike. The *combination* of circumstances is crucial—and fatal to Pike's claim. Pike fit the physical description reported by the victims: African-American male, wearing all-dark clothing. DSOF ¶ 23. He fit the location, just around three blocks from 418 West Englewood[11]—and he was running. DSOF ¶ 24; Pl.'s Resp. ¶ 24. He fit the timing, because he was stopped within minutes of the crime. *See* Exh. H at 1 (reporting that the time of robbery was 10:33 p.m.), 4 (reporting that the show-up was done by 10:53 p.m., and observing that the victim identified Pike "as one of the three offenders that robbed him *minutes before* [assisting officer's] arrival" (emphasis added)). It is of course true that circumstances supporting a stop cannot be so broad that they "describe a very large category of presumably innocent" persons. *See Reid v. Georgia*, 448 U.S. 438, 441 (1980). But the supporting circumstances here—the officers saw Pike running late at night in Chicago during the winter (when presumably very few people are on the street),[12] near in time and

---

[11]As discussed earlier, *see supra* at 3 & n.5, Pike was running northbound on Parnell Avenue toward 63rd Street, which is around three blocks southeast of 418 West Englewood.

[12]As noted above, in addition to the description of the suspect, as well as the temporal and geographic proximity to the crime, *Broomfield* also found it persuasive that "the streets in the vicinity of the store were nearly deserted." 417 F.3d at 55. The Court notes here that Pike has not put forth any evidence establishing that there were

place to 418 West Englewood—*combined* with the description—establishes reasonable suspicion. Add to this that there was little reason to doubt the accuracy of the description given by *identified victims*—as opposed to *anonymous informants*. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). Based on all of these circumstances, no reasonable trier of fact could find otherwise: the officers had reasonable suspicion to stop Pike.

Pike really makes only two arguments to resist this conclusion, but even viewing the evidence in Pike's favor, the contentions must be rejected. First, Pike argues that he had slowed to a walk by the time that the officers approached him. *See* R. 100, Pl.'s Resp. Br. at 3, 10, 13. Second, Pike contends that he was running "towards the reported crime scene, not away from it." *See* Pl.'s Resp. Br. at 3, 9, 10. Both of these arguments suffer from similar flaws: first, they are contrary to the substantive standard—the circumstances must be viewed in their totality, rather than picking at two pieces of information amongst the match in physical description, time, proximity, and the fact that Pike was indeed running when first spotted by the officers. More importantly, the arguments also do not account for another requirement of the governing standard, namely, officers are permitted to rely on their experience to evaluate otherwise innocent behavior. *Lenoir*, 318 F.3d

---

pedestrians out that night (past 10:30 p.m.) near 418 West Englewood on a winter night in Chicago. *See id.* ("It would have been different had it been Lagos at high noon.").

at 729. The officers reasonably believed it was suspicious that Pike was running fast (the officers perceived it as "top speed"), particularly when there was "snow on the ground," and so close to the victims' home. DSOF ¶ 25.[13] Even Pike's slowing down to a walk does not necessarily cut against the suspicion. *Cf. United States v. Arvizu*, 534 U.S. 266, 275 (2002) (observing that, in some circumstances, a driver "slowing down after spotting a law enforcement vehicle" does not dispel reasonable suspicion and might even add to it). The same goes for Pike's direction of travel: sure, Pike was running northbound on South Parnell, which is south of the victims' home, but the home (at 418 West Englewood) is north*east* of South Parnell. It is not as if Pike was on Englewood running directly *toward* the home. Indeed, Pike himself supplied a reason why his direction of travel was not so innocent: at his deposition, he testified that he started running in response to seeing a police car and hearing sirens.[14] Exh. A, Pike Dep. 29:2-5. If true, then Pike's goal was to run *away* from any police presence, and running on Parnell to cross 63rd Street was consistent with that goal, because by that point, the police car had passed Pike's position on 63rd Street. To be sure, on summary judgment, the Court must give the non-movant the benefit of reasonable inferences, but the evaluation is governed by the substantive standard, and here that disallows a jury from finding that the officers did not have reasonable suspicion for the stop.

[13]Just like with certain other responses to the Officers' Rule 56.1 Statement, Pike does not actually deny the officers' description of what he was doing when they spotted him. Pl.'s Resp. DSOF ¶ 25. Pike does call some of the assertions (without specifying which ones) "speculative" and "subjective," but Pike does not call into question that the officers did in fact believe what they say they saw him doing. *Id.*; *see also* Pl.'s Resp. DSOF ¶ 24.

[14]The parties dispute whether the officers had their siren on while looking for the robbery suspects. *Compare* Exh. A, Pike Dep. 29:2-5, *with* Vaughn Dep. 19:14-16.

One last point is worth making on the investigatory stop: even if there really is a jury question on whether the officers had reasonable suspicion to make the stop, the qualified-immunity doctrine would kick-in to defeat the claim. The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). Put another way, the general purpose of qualified immunity is "to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). This standard provides "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). In this case, even an officer well versed in Fourth Amendment law would not know that he was violating it by stopping Pike in these circumstances. It is not as if there is a governing case that spells out why all of the facts known to the officers would fall short of reasonable suspicion. At the very least, qualified immunity would defeat the claim that the investigatory stop was not premised on reasonable suspicion.

### ii. Handcuffing, Detaining, and Transporting
### As Part of the Investigatory Stop

The next question is whether the officers unreasonably went beyond the bounds of an investigatory stop, even if they did have reasonable suspicion to make the stop itself. The Fourth Amendment not only requires reasonable suspicion to stop someone, it also requires that the investigation following it be reasonably related in scope to the circumstances that justified the stop in the first place. *See Bullock*, 632 F.3d at 1012. Pike argues that the officers' conduct—which included handcuffing, detaining, and transporting him—exceeded the permissible scope of an investigatory stop and amounted to an arrest without probable cause. Pl.'s Resp. Br. at 10-14.

To determine whether the force used to conduct an investigatory stop was reasonable, or instead transformed the encounter into a full arrest, the Seventh Circuit considers "whether the surrounding circumstances would support an officer's legitimate fear for personal safety." *Matz v. Klotka*, 769 F.3d 517, 526 (7th Cir. 2014); *see also Jewett v. Anders*, 521 F.3d 818, 824 (7th Cir. 2008). Courts in the Seventh Circuit also "take into account the suspect's own behavior in resisting an officer's efforts." *Matz*, 769 F.3d at 526; *Jewett*, 521 F.3d at 824-25.

In *United States v. Stewart*, for example, the Seventh Circuit held that handcuffing and placing a suspect in the back seat of a police car did not transform an investigatory stop into a formal arrest. 388 F.3d 1079, 1084-85 (7th Cir. 2004). *Stewart* noted that "[t]he permissible scope of a *Terry* stop has expanded in recent years to include the use of handcuffs and temporary detentions in squad cars." *Id.*

at 1084. And the Seventh Circuit observed that "[t]he bank robbery was less than an hour old, and Stewart matched the best description of the suspect that the officers possessed. The robbery suspect wielded a semiautomatic rifle and committed a crime of violence. Stewart behaved suspiciously giving a vague and implausible story about where he had come from and where he was going." *Id.* at 1085. Given these circumstances, *Stewart* held that it was reasonable for the officers to handcuff and detain Stewart based on a belief that he was potentially dangerous. *Id.* at 1084-85; *see also Matz*, 769 F.3d at 524-27 (holding that drawing weapons, placing handcuffs on the suspect, and detaining the suspect did not amount to an arrest in order to protect officers and diligently investigate the suspects).

Likewise, in *United States v. Vanichromanee*, the Seventh Circuit held that detaining three suspects in a parking garage and moving them to an apartment was an investigatory stop and not an arrest. 742 F.2d 340, 344 (7th Cir. 1984). The opinion observed that "[a] police officer may, short of an arrest, detain an individual briefly 'in order to determine his identity or to maintain the status quo momentarily while obtaining more information' … ." *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). Detaining and moving the suspects was reasonable because (1) the purpose of the detention was to "identify[] the three men and … maintain[] the status quo"; (2) moving the suspects did not make the stop more intrusive given that "the transfer here was not to a more institutional setting, … but to a residential dwelling unit"; and (3) the length of the detention was reasonable—"five

to ten minutes spent in the parking garage and [an] additional five to ten minutes in the apartment … ." *Id.* at 344-45. Based on these reasons, the Seventh Circuit concluded that detaining and moving the suspects as part of an investigatory stop was reasonable under the circumstances. *Id.* at 345.

Like the officers in *Stewart* and *Vanichromanee*, Officers Vaughn, Wright, and Carmona took reasonable, protective measures in order to safely and effectively resolve their suspicions during an investigative stop. No jury could find otherwise. The facts here are similar to *Stewart*: the robbery was less than an hour old and Pike matched the best description of the suspect that the officers possessed. *See* 388 F.3d at 1085. Moreover, as in *Stewart*, the robbery suspect had a firearm and committed a crime of violence.[15] *Id.* To be sure, the officers here handcuffed Pike after confirming that he did not have a weapon (or did not have it anymore), but the fact that the wanted suspect had used a gun in the robbery gave the officers reason to believe that Pike posed a danger even if he no longer had it. And other circumstances warranted handcuffing Pike: the officers' car did not have a protective barrier and Officer Carmona had to sit in the back with Pike. *See* DSOF ¶ 34; Pl.'s Resp. DSOF ¶ 34; Vaughn Dep. 45:22-46:11; Carmona Dep. 23:22-24:3. Moreover, the officers knew that at least two other armed robbers had fled from the crime scene and were on the loose in the area. *See Matz*, 769 F.3d at 524, 526

---

[15]*Stewart* also found it persuasive that the suspect acted suspiciously by "giving a vague and implausible story about where he had come from and where he was going." 388 F.3d at 1085. Here, Pike did not give an implausible story about his whereabouts, attempt to flee, or otherwise resist the officers' efforts. R. 110, PSOF ¶ 8; Defs.' Resp. PSOF ¶ 8. The suspect's behavior is just one factor, however, in determining the reasonableness of an investigatory stop.

(finding it reasonable for officers to draw weapons, handcuff, and detain the plaintiff pursuant to a *Terry* stop in part because the officers were outnumbered by possibly armed individuals).

Pike's detention and transport is also similar to that of the suspects in *Vanichromanee*, where the Seventh Circuit held that briefly detaining and moving suspects to an apartment to identify them was reasonable. 742 F.2d at 344-45. Although it is unclear exactly how long the officers detained Pike, Pike does not argue—nor is there any evidence indicating—that the length of his detention was unreasonable, and it was no more than 20 minutes.[16] What's more, the officers here did not move Pike to a police station or for further detention, but rather drove him to the crime scene for a show-up identification. DSOF ¶ 33; Pl.'s Resp. DSOF ¶ 33; Exh. A, Pike Dep. 42:2-6, 56:21-57:17; Vaughn Dep. 22:19-22; Wright Dep. 18:2-5; Carmona Dep. 23:15-24. In the absence of a prolonged detention, officers may transport a suspect back to a crime scene for identification as part of a lawful *Terry* stop. *See, e.g.*, *United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006); *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006); *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990-93 (9th Cir. 2002); *United States v. Short*, 570 F.2d 1051, 1054

---

[16]As far as can be discerned from the record, it appears that his detention before the show-up lasted around 15-20 minutes. *See* Exh. A, Pike Dep. 42:2-13; 46:6-14; 57:12-17 (Pike states that the investigatory stop and search lasted about three to four minutes and that a minute and a half after the search, the officers and Pike got in the police car and drove to 418 West Englewood, but on the way "took a break" in an alley); Exh. F at 32 (victim testifies that the officers came to his house with Pike "[a]bout 15 minutes" after he had reported the crime to an officer); Exh. H at 4 ("The above victim positively identified the above offender as one of the three offenders that robbed him minutes before [arresting officer's] arrival … ." (capitalization of all words removed from original)); *id.* at 1 (reporting that the time of robbery was 10:33 p.m.), 4 (reporting that the show-up was done by 10:53 p.m.).

(D.C. Cir. 1978). Under these circumstances, even drawing all inferences in Pike's favor, the Court holds that the officers' decision to handcuff, detain, and relocate Pike was not an unlawful arrest, but rather part of a lawful investigatory stop. No reasonable trier of fact could find otherwise.

It is worth pointing out that, even if a jury could find that the stop really became a full-blown arrest that lacked probable cause, still the officers would be entitled to qualified immunity against the claim. Cases like *Stewart* and *Vanichromanee* come too close to outright justifying the reasonableness of the cuffing, detention, and transportation to clearly inform an officer that the case law supposedly dictated otherwise. So, in the alternative, the claim would be dismissed on qualified immunity grounds.

## B. Reasonableness of the Search

There remains one very limited aspect of Pike's Fourth Amendment claim, and it does survive both summary judgment and the qualified immunity defense. Specifically, Pike claims that Officer Vaughn's search during the investigatory stop exceeded the permissible scope of a *Terry* frisk. (This search claim can only apply to Vaughn, because Pike does not assert that any of the other officers did what Vaughn did.) Pike maintains that Vaughn "scrupulously" searched him by, among other things, going through his pant pockets, lifting up and jiggling his pants, and taking his cellphone. R. 102-2 (Exh. 2, Pike Dep. 41:13-18, 42:20-44:8). For purposes of summary judgment, that set of facts must be taken as true, notwithstanding the Officers' different version of the patdown. *See* Vaughn Dep. 20:22-24, 21:16-18;

Wright Dep. 18:2-5. Vaughn even accepts (for purposes of summary judgment) that he reached into Pike's pant pockets during the search. Vaughn wrote one of his Rule 56.1 Statements in this way: "Plaintiff admits that Officer Vaughn conducted the patdown *by going in his pants pockets* and checking his outer garments." *See* DSOF ¶ 32 (emphasis added)); Exh. A, Pike Dep. 43:11-18.

The problem with Vaughn's motion for summary judgment on this narrow claim is that the case law establishes that, absent some circumstances justifying a more intrusive search, an officer is limited to a patdown of the *outside* of a suspect's clothing during a *Terry* stop. It is true that as part of a *Terry* stop, an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, … ." 392 U.S. at 27. "Though not every *Terry* stop justifies a frisk, some crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime." *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007). In light of the suspected crime here—armed robbery—it was perfectly reasonable for Vaughn to pat down Pike for weapons. *See Barnett*, 505 F.3d at 640.

But *Terry* itself says that the scope of the search must be limited to what is "minimally necessary" to discover any weapons. *Terry*, 392 U.S. at 30; *see also United State v. Hairston*, 439 F. Supp. 515, 517 (N.D. Ill. 1977). Several cases

suggest that reaching into a suspect's pockets during an investigatory stop before[17] conducting a patdown exceeds the scope of a permissible frisk. In *Terry*, the Supreme Court made a point of distinguishing an outside-only patdown versus going into the suspect's pockets. 392 U.S. at 29-30. Specifically, the Supreme Court observed that the officer "patted down the outer clothing of [the suspects]. *He did not place his hands in their pockets* or under the outer surface of their garments until he had felt weapons, … ." *Id.* (emphasis added). Reasoning that the officer "confined his search to what was minimally necessary to learn whether the men were armed and to disarm them," the Supreme Court held that the patdown was justified. *Id.* at 30.

The Court drove this point home in *Terry*'s lesser-known companion case, *Sibron v. New York*, 392 U.S. 40 (1968). In *Sibron*, the Supreme Court actually held that an officer performed an *unlawful* search when he "with no attempt at an initial limited exploration for arms, … thrust his hand into [the suspect's] pocket and took from him envelopes of heroin." *Id.* at 65. The Supreme Court concluded that "[t]he search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id.* This holding not only makes it reasonable for a jury to find that Vaughn went too far by (allegedly) going into Pike's pockets and lifting up his pants, the holding also defeats the qualified immunity defense to this claim. This is the Supreme Court explaining that going

---

[17]Of course officers can reach into a suspect's pockets to retrieve a weapon *after* having detected it during a protective patdown. *See Terry*, 392 U.S. at 29-30.

into a suspect's pockets (before detecting a weapon) is unreasonable when performing a *Terry* frisk.[18] To be sure, some circumstances would indeed justify going into a suspect's pockets, even if a patdown did not detect a weapon: for example, the suspect might be wearing a coat that is so thick and bulky that an officer cannot reasonably be assured that just patting down the outside will detect a weapon. Or the suspect might quickly put something into his pocket as the officer approached; and in that situation, the officer reasonably would want to immediately go into the pocket and secure what is in there (especially if the suspect kept his hand inside the pocket).[19]

But Vaughn does not offer any special circumstances like that, or any at all. Nor do the Officers argue in the alternative that Officer Vaughn conducted the search incident to a lawful arrest. Had the search been performed incident to a lawful arrest—which would have required probable cause—*Terry* would not have limited the scope of Vaughn's search. And finally, the Officers do not even address Pike's contentions that Vaughn lifted up his pants.[20] *See* Exh. 2, Pike Dep. 41:13-18;

---

[18]Courts in this district have held the same. For example, in *Bedenfield v. Shultz*, the district court held that an officer's search "exceeded the bounds of *Terry*" where "[t]he officers reached into [the suspect's] pockets." 2002 WL 1827631, at *6 (N.D. Ill. Aug. 7, 2002) ("*Terry* allows a protective pat down search on the outside of an individual's clothing."). And in *United States v. Hairston*, the district court concluded that an officer's search exceeded the bounds of *Terry* where an officer, "[i]mmediately upon noticing [a] bulge, and without further inquiry … reached into [the suspect's] pants and retrieved [a] weapon … ." 439 F. Supp. at 519.

[19]Courts have recognized situations where the circumstances may justify by-passing a protective patdown under *Terry* during an investigatory stop. *See, e.g.*, *Adams v. Williams*, 407 U.S. 143, 144-48 (1972); *United States v. Albert*, 579 F.3d 1188, 1196 (10th Cir. 2009); *United States v. Bonner*, 363 F.3d 213, 217-18 (3d Cir. 2004); *United States v. Hill*, 545 F.2d 1191, 1192-93 (9th Cir. 1976) (per curiam).

[20]The Court notes that if true, these facts could further support a finding that Officer Vaughn performed an unlawful search of Pike, as opposed to a lawful protective patdown.

42:20-44:8. Because a jury could find that Vaughn went beyond what was "minimally necessary" to discover weapons, summary judgment must be denied, and as noted above, in light of *Sibron*, qualified immunity does not apply.

## C. Detective Foster

All that remains is Pike's claim against Detective Foster. Detective Foster argues that he was not present when Officers Vaughn, Wright, and Carmona searched and seized Pike, and as a result, he cannot be held liable for violating Pike's Fourth Amendment rights. Defs.' Mot. Summ. J. at 11. Pike does not address this issue in his response brief. He does contend, in his Response to the Officers' Statement of Facts, that "Defendant Foster interrogated Mr. Pike at the police station following his arrest … ."[21] Pl.'s Resp. DSOF ¶ 39. Pike also admits in his Response, however, that "Detective Foster had *no involvement in the initial stop,*

---

In *United States v. Aquino*, for example, the Eighth Circuit held that an officer "transformed the investigatory *Terry* detention into an arrest when he *lifted [the suspect's] pant leg*" to reveal a concealed bulge. 674 F.3d 918, 927 (8th Cir. 2012) (emphasis added). Likewise, in *United States v. Askew*, the D.C. Circuit held that an officer's search "exceeded the bounds of *Terry*" given that the officer "*manipulated appellant's jacket*, partially unzipping and opening it, … [to] see the sweatshirt underneath appellant's jacket." 529 F.3d 1119, 1133 (D.C. Cir. 2008) (emphasis added). With regard to the cell phone, Pike does not explain how taking the cell phone during the investigatory stop would give rise to any Fourth Amendment violation, or any damages arising from it. Vaughn would have been allowed to prevent Pike from using his phone during the investigatory stop (and indeed, as explained above, the handcuffing of Pike was reasonable), so taking the phone added nothing to the permissible investigatory stop.

[21]In the Officers' Statement of Facts, the Officers allege that Pike "is suing Detective Foster because [he] blames him for his current incarcerated status." DSOF ¶ 39. While Pike disputes this fact and responds that "Defendant Foster interrogated [him] at the police station following his arrest … ," Pl.'s Resp. DSOF ¶ 39, he fails to offer record evidence supporting this response. The Court notes that the Northern District of Illinois Local Rule 56.1(b)(3)(B) states that a non-moving party's response "*shall* contain … *in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon*" (emphasis added).

*protective patdown, and detainment* for a showup identification of [Pike]." DSOF ¶ 38; Pl.'s Resp. DSOF ¶ 38 (emphasis added).

"An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (emphasis omitted); *see also Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998). There is no vicarious liability under § 1983. Here, the "constitutional deprivation" Pike alleges is an unlawful search and seizure under the Fourth Amendment. But as Pike admits, Detective Foster was not even present when the alleged search and seizure occurred. DSOF ¶ 38; Pl.'s Resp. DSOF ¶ 38; Foster Dep. 21:13-15, 22:3-14, 22:24-23:13. By the time Detective Foster encountered Pike, "the constitutional violation [Pike] alleges had already taken place." *Jenkins*, 147 F.3d at 583.

That Detective Foster might have interrogated Pike—a fact unconfirmed by the record, *see supra* Section III.C at 23 n.21—is irrelevant. Any Fourth Amendment claim did not extend beyond the point when the officers had probable cause to arrest Pike, which arose when the victims positively identified him as one of the robbers. And in any event, any allegation that Pike's interrogation was unconstitutional would actually implicate his Fifth or Sixth—not his Fourth—Amendment rights. Pike has not brought those claims. Summary judgment as to Detective Foster is therefore granted.

## IV. Conclusion

For the reasons discussed above, the motion for summary judgment, R. 93, is granted in large part, but denied as to the search allegedly performed by Vaughn, namely, going into Pike's pockets and lifting up his pants leg. Before the next status hearing, the parties must discuss settlement. The remaining claim is exceedingly narrow, and even if Pike were to win a liability verdict, a reasonable damages award would be modest. Indeed, because Defendants have prevailed on the bulk of the claims, it is *Pike* that now faces a Rule 54(d) bill of costs for those expenses that are reasonably attributable to the claims that he lost (including the claim against Foster). It is in both sides' interest to seriously consider resolving the case now. The Court also wishes to express thanks to court-recruited Plaintiff's counsel, who was assigned to handle the case and has performed admirably in doing so.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: February 11, 2016